IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JULIE MCBRIDE,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )   1:20CV1039
                                        )
KILOLO KIJAKAZI,                        )
Acting Commissioner of Social Security, )
                                        )
                    Defendant.          )

### MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Julie McBride ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed applications for both SSI and Disability Insurance Benefits ("DIB") on October 10, 2017, alleging a disability onset date of March 12, 2012. (Tr. at 12, 14, 47, 234.)[1] Her applications were denied initially (Tr. at 64-91, 128-32) and upon reconsideration (Tr. at 92-127, 136-53). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 154-55.) On December

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #9].

12, 2019, Plaintiff, along with her non-attorney representative, attended the subsequent telephone hearing, during which both Plaintiff and an impartial vocational expert testified. (Tr. at 12.) At that time, Plaintiff amended her alleged onset date to her application date, October 17, 2017. (Tr. at 12, 14, 47, 234.) Because this date falls well after Plaintiff's date last insured of September 30, 2014 for DIB purposes (Tr. at 14), the amendment effectively withdrew Plaintiff's DIB claim.

Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 22-23), and, on September 15, 2020, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

2

scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on

---

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her application date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential analysis. (Tr. at 14.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> degenerative disc disease, other and unspecified arthropathies, fibromyalgia, neurodegenerative disorders of the central nervous system, chronic obstructive pulmonary disease (COPD), osteomyelitis, periostitis and other infections, and essential hypertension[.]

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

Case 1:20-cv-01039-TDS-JEP   Document 18   Filed 02/18/22   Page 5 of 18

(Tr. at 14.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 16-17.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could:

> perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except [Plaintiff] is frequently able to push and pull with her right lower extremity, climb ramps and stairs, balance, kneel, crouch, and crawl. She is occasionally able to climb ladders, ropes, and scaffolds, and stoop. The claimant must avoid hazards, including machinery and heights.

(Tr. at 17.) The ALJ found at step four of the analysis that Plaintiff's past relevant work as a personal care assistant/CNA did not exceed her RFC. (Tr. at 20-21.) Alternatively, the ALJ determined at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 21-22.)

Plaintiff now argues that, in formulating the RFC assessment, "[t]he ALJ misinterpreted or overstated what evidence may support the ALJ's decision and materially failed to obtain adequate guidance from an opining professional." (Pl.'s Br. [Doc #15] at 3.) After a thorough review of the record, the Court agrees that substantial evidence fails to support the ALJ's decision. As acknowledged by the ALJ, Plaintiff's disability claim chiefly relies on her complaints of disabling pain in her back and lower right extremity. (Tr. at 17.) However, in discounting these complaints, the ALJ failed to fully consider the medical evidence of record.

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess

6

how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit recently clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95–96. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529:

7

(i) [Plaintiff's] daily activities;
(ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

According to the regulatory guidance:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities. . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities. . . .

SSR 16-3p.

The Court of Appeals for the Fourth Circuit recently emphasized the importance of fairly evaluating an individual's symptoms and remanded a case where the ALJ (1) improperly discredited the claimant's complaints "based on the lack of objective evidence corroborating them" and (2) failed to fully consider the medical evidence in the record. Arakas, 983 F.3d at 96-97. In reversing the ALJ's decision, the Fourth Circuit found that "the ALJ made several errors in his assessment of [the claimant's] subjective complaints regarding her symptoms. He applied the wrong legal standard by effectively requiring [her] to provide objective medical evidence of her symptoms. He improperly cherry-picked, misstated, and mischaracterized

8

facts from the record. [And he] drew various conclusions unsupported by substantial evidence and failed to explain them adequately." Id. at 102.

Here, as in Arakas, the ALJ's characterization of the medical evidence omits or glosses over significant evidence favorable to Plaintiff's claim. In particular, the ALJ presents Plaintiff's reported symptoms, treatment note summaries, objective testing, and surgical noes in laundry-list form with little to no analysis or detail. As set out in the administrative decision, the ALJ recounts that,

> [f]rom time to time, [Plaintiff] reported back pain, right leg pain, bilateral foot pain, neck pain, hip pain, shoulder pain, leukocytosis, night sweats, heart murmur, hypertension, chronic cough, shortness of breath, arthritis, spasms, numbness, and tingling (1F/1, 2F/1, 11, 5F/44, 53, 6F/21, 7F/13, 8F/1, 6, 13, 38, 11F/11, 12F/2, 8, 13F/19). However, despite these complaints, examinations showed lungs clear to auscultation, and normal strength, range of motion, gait, and station (2F/12, 6F/19, 25, 7F/15, 8F/3, 11, 41, 11F/13, 12F/5, 15, 13F/13, 20, 14F/41). Physical examinations also showed mixed findings of wheezing, tenderness, sensation, and reflexes, as well as some abnormal findings such as positive straight-leg raise, foot weakness, edema, sciatic notch tenderness on the right side, and an inability to sit for long periods (2F/2, 11, 5F/45, 6F/38, 11/13, 12F/6, 13F/20, 14F/6, 41). Diagnostic imaging also supported the examination findings by showing degenerative changes in the lumbar spine and left knee, mild arthritic changes to the left shoulder, and heel spurs (1F/4-5, 3F/138-139, 4F/3, 6F/28, 8F/13, 12F/22, 14F/27-28). However, diagnostic imaging of the hip was normal, and imaging of the neck was unremarkable (5F/52, 11F/7). A nerve conduction study showed normal findings, while pulmonary function tests were within normal limits (3F/63, 140, 4F/8). Moreover, the record shows [Plaintiff] is sixty-five inches tall and weighs approximately 186-253 pounds for a body mass index (BMI) of 30.5-41.46, indicating that she is obese, complicating her overall physical system (3F/58, 98, 6F/25, 12F/9, 13F/13). Her vital statistics occasionally showed elevated blood pressure readings, despite medication (3F/71, 111, 13F/16, 20). Laboratory examinations also revealed abnormal white blood cell levels suggestive of leukocytosis (14F/2, 14, 19). Treating providers prescribed various medications to treat her symptoms (6F/1, 9F, 14F/36). [Plaintiff] underwent various treatment modalities, such as epidural steroid injections and back surgeries (5F/13-38, 7F/17-18, 8F/14, 12F/30-32, 14F/33- 34). Yet despite [Plaintiff's] allegations, she often denied symptoms of

9

muscle pain, muscle weakness, joint pain, neck pain, back pain, and difficulty breathing (2F/14, 6F/21, 13F/12, 19, 14F/5).

(Tr. at 18.)

Most notably, the ALJ mentions Plaintiff's diagnostic imaging and surgeries without mentioning, let alone discussing, the results of these procedures or their implications on Plaintiff's pain. The ALJ's discussion, as set out above, summarily notes that diagnostic imaging showed "degenerative changes in the lumbar spine" and that Plaintiff "underwent various treatment modalities, such as epidural steroid injections and back surgeries." (Tr. at 18.) However, Plaintiff's back and related leg pain finds significant support in her MRI and surgical results which the ALJ did not address or include. For example, a lumbar MRI performed on July 28, 2017, just before Plaintiff's application date, revealed, in pertinent part, as follows:

> L4-5: Mild disc bulge with a superimposed left foraminal zone disc protrusion and bilateral facet arthropathy. Minimal spinal canal narrowing. Moderate left and mild right neural foraminal stenosis.
>
> L5-S1: Diffuse disc bulge with a superimposed broad right foraminal and subarticular zone disc protrusion that mildly narrows the right lateral recess and contacts the traversing right S1 nerve root. Mild spinal canal stenosis. Severe right and mild left neural foraminal narrowing.
>
> IMPRESSION: Degenerative spondylosis of the lumbar spine, most severe at the L4-5 and L5-S1 levels as described above. Moderate left foraminal narrowing at L4-5 and severe right foraminal narrowing at L5-S1.

(Tr. at 340.) Thereafter, on November 13, 2017, Dr. Ernesto Botero, a neurosurgeon, treated Plaintiff for back pain with radiating symptoms to the right leg. (Tr. at 333.) Dr. Botero noted limping, positive bilateral straight leg raises, sciatic notch tenderness, mild weakness with right foot dorsiflexion and plantar flexion, and some numbness involving the S1 dermatome. (Tr.

10

at 334.) Based on these clinical results and Plaintiff's prior MRI, Dr. Botero diagnosed "[r]ight sided radiculopathy with a herniated disc, mostly in the foramen [as well as] [a]rthritis at the level of facet 4-5." (Tr. at 335.) Plaintiff stated that she did not want injections based on her prior experiences with them. (Tr. at 335.) Dr. Botero explained the risks of surgery, but Plaintiff ultimately put off her decision until after the New Year. (Tr. at 336.)

On February 26, 2018, Plaintiff sought further neurosurgical treatment with Dr. David Jones, a colleague of Dr. Botero. (Tr. at 653.) At that time, Plaintiff reported severe back pain extending to the right buttock and posterior thigh, aggravated by activity. (Tr. at 653.) Examination again revealed a positive straight leg raise on the right. (Tr. at 656.) Dr. Jones noted a lumbar MRI showing a left L4-5 extraforaminal disc protrusion and a right L5-S1 pre-foraminal and foraminal disc protrusion which could irritate the right L5 and S1 nerve root. (Tr. at 657.) Having failed reasonable attempts at conservative treatment, Plaintiff agreed to surgery. (Tr. at 635, 657.)

On March 21, 2018, Plaintiff underwent a right L5-S1 hemilaminectomy, medial facetectomy, and foraminotomy followed by microdiscectomy for her L5-S1 herniated nucleus pulposus. (Tr at 636.) Unfortunately, the record indicates that Plaintiff's relief from these procedures was short-lived. On April 9, 2018, Plaintiff returned to Dr. Jones reporting severe right leg pain with numbness and tingling despite taking both Percocet and Mobic. (Tr. at 645.) Plaintiff also testified at her hearing that sitting became painful during this time. (Tr. at 52.) Dr. Jones added a Medrol Dosepak to Plaintiff's medications and planned to order a new MRI if Plaintiff's condition did not improve. (Tr. at 648-49.)

11

As Plaintiff correctly notes, Ellen Denny, Ph.D., who conducted a psychological consultative examination at the request of the Social Security Administration on August 23, 2018, indicated that Plaintiff's displayed noticeable symptoms at that time. (Tr. at 697.) Specifically, Dr. Denny recounted that Plaintiff "walked slowly and with difficulty, complaining of back pain. She had difficulty with sitting and standing, and asked to stand at one point during the evaluation." (Tr. at 697.) At an appointment with her primary care provider the same week, Plaintiff reported significant low back pain "running down [her] right side," which she rated as high as 10/10 on the pain scale. (Tr. at 773.)

In an attempt to alleviate her continuing symptoms, Plaintiff agreed to additional back surgery. However, her surgery was postponed due to elevated white cell counts in her pre-surgical bloodwork. In a letter dated March 25, 2019, Dr. Jones stated that Plaintiff was scheduled for surgery on March 14, 2019, but the surgery was canceled due to abnormal lab work. (Tr. at 778.) Dr. Jones also noted that neurology would not be prescribing narcotics for Plaintiff until her labs returned to normal. (Tr. at 778.) Unfortunately, the change in medications caused Plaintiff to experience a significant increase in back pain, and she was treated in the emergency department with a muscle relaxer, Mobic, and steroids. (See Tr. at 763, 786.) Plaintiff followed up with her primary care provider who prescribed clonidine for withdrawal symptoms. (Tr. at 763.) On April 1, 2019, Plaintiff again presented to the emergency room reporting low back pain and chronically elevated white blood cell counts. (Tr. at 714.) She was instructed to follow up with surgery, primary care, and hematology. (Tr. at 714.)

Case 1:20-cv-01039-TDS-JEP   Document 18   Filed 02/18/22   Page 12 of 18

Plaintiff's subsequent June 7, 2019 lumbar MRI supported her continuing reports of low back pain during this period. The imaging revealed as follows:

> L4-L5: Disc space desiccation. Far-lateral and foraminal protrusion to the LEFT with osseous spurring. Mild facet arthropathy. LEFT L4, possible LEFT L5 nerve root impingement.
>
> L5-S1: RIGHT laminotomy. Advanced disc space narrowing. Recurrent disc extrusion central and to the RIGHT. Peridiscal enhancement, without concern for arachnoiditis or significant epidural fibrosis. RIGHT S1 displacement is seen. Significant RIGHT-sided foraminal narrowing appears to compress the RIGHT L5 nerve root foraminal narrowing on the LEFT could also affect the L5 nerve root on that side. Compared with the previous MRI from mission hospital dated 08/31/2018, the disc extrusion at L5-S1 has not significantly regressed.
>
> IMPRESSION: Recurrent disc extrusion at L5-S1, RIGHT is the dominant finding. RIGHT L5 and RIGHT S1 nerve root impingement are noted. Potentially symptomatic LEFT-sided neural impingement at L4-5 and also L5-S1.

(Tr. at 806-07.) Of particular note, the MRI revealed visible nerve root impingement as the probable source of Plaintiff's radiating pain. Dr. Jones reviewed the MRI at Plaintiff's appointment on June 11, 2019 and agreed that Plaintiff had a recurrent disc herniation at L5-S1. (Tr. at 734.) He also documented Plaintiff's continuing severe back and right leg pain, noting that she was in mild distress with horizontal and vertical nystagmus. (Tr. at 731, 733.)

On June 28, 2019, Dr. Jones performed a "redo" right L5-S1 hemilaminectomy and medical facetectomy and foraminotomy followed by a "redo" microdiscectomy on the right at L5-S1. (Tr. at 749.) However, on August 26, 2019, Plaintiff returned to Dr. Jones, reporting that, although she experienced some improvement after surgery, she still had back pain, intermittent spasms with a shock-like sensation, and some numbness and tingling in the right leg. (Tr. at 726.) Dr. Jones prescribed Percocet. (Tr. at 729.) At her December 2019 hearing,

13

Plaintiff testified that she was supposed to have a third surgery, which she described as a fusion surgery, to address her continuing symptoms, but she needed to get insurance first. (Tr. at 54.)

Despite this extensive favorable evidence, the ALJ mentioned Plaintiff's surgeries and diagnostic imaging only briefly and never acknowledged her well-documented back abnormalities as a probable source of her pain. Instead, the ALJ attempted to undermine the credence of Plaintiff's pain reports by citing instances in which treatment notes document no issues with strength, gait, or range of motion. In doing so, however, the ALJ failed to recognize that pain, rather than mobility issues, was the hallmark of Plaintiff's nerve root impingement. More importantly, pain itself, rather than mobility issues, forms the main basis for Plaintiff's disability claim.

In addition, the ALJ includes a string of citations to portions of the treatment notes to support a finding that Plaintiff "often denied symptoms of muscle pain, muscle weakness, joint pain, neck pain, back pain, and difficulty breathing" and that examinations showed "normal strength, range of motion, gain, and station," but the ALJ failed to include the full context of those treatment notes. Taking them in chronological order, the ALJ string cites to a June 2017 treatment note (Tr. at 18 (citing Tr. at 344)), but on review that treatment note reflects "joint pain; Neck pain; Back pain," and the provider ordered an x-ray and MRI of Plaintiff's lumbar spine. (Tr. at 343-44.) The ALJ next string cites a treatment note from two months later, in August 2017 (Tr. at 18 (citing Tr. at 346, 597)), but that August 2017 treatment note reflects that Plaintiff was being referred to neurology for ongoing low back pain (Tr. at 347). The ALJ next string cites a treatment note from three months later, in November 2017

14

(Tr. at 18 (citing Tr. at 603)), but that was just a visit for lab draws and medication refills (Tr. at 601), and was the same week that Plaintiff saw Dr. Botero, who noted that Plaintiff was miserable and unable to work, with limping, positive bilateral straight leg raises, sciatic notch tenderness, mild weakness, and some numbness, with a recommendation for back surgery, as discussed above. (Tr. at 333-36). The ALJ next string cites to a primary care visit on February 19, 2018 and a visit to the neurologist Dr. Jones the next week on February 26, 2018 (Tr. at 18 (citing Tr. at 599, 655-56)), but the primary care treatment notes reflect ongoing muscle pain and back pain (Tr. at 599), and Dr. Jones's treatment notes reflect that Plaintiff was in severe pain with disc protrusions irritating the nerve root and with "debilitating pain causing functional disability" not responding to conservative measures with a recommendation for surgery. (Tr. at 653, 657-58.) The ALJ next string cites to a treatment note from the next month on March 21, 2018 (Tr.at at 18 (citing Tr. at 634, 685)), but this is the post-surgical note from Plaintiff's first back surgery, noting that she had failed at conservative treatment measures, that she suffered severe and unremitting low back pain, that surgery was warranted, and that the surgery involved decompression of the nerve root, with a pre and post operative diagnosis of "Right L5-S1 herniated nucleus pulposus with back and right leg pain." (Tr. at 632, 635-37.) The ALJ next string cites to a treatment note from 3 weeks later, on April 9, 2018 (Tr. at 18 (citing Tr. at 647)), but that is the immediate follow-up post back surgery, and notes ongoing back pain and severe right leg pain, with indication for a repeat MRI (Tr. at 645, 648). The ALJ next string cites to a treatment note the next year, in February 2019 (Tr. at 18 (citing Tr. at 769, 770)), but that treatment note came during the time period when she was scheduled for and waiting her second back surgery and also reflects that she was "unable

15

to sit for long periods" and that pain "inhibits activity and normal functioning" (Tr. at 770). The ALJ then cites several treatment notes from the next month, in late March and early April 2019 (Tr. at 18 (citing Tr. at 716, 762, 763, 784)), but this is when Plaintiff was scheduled for her second back surgery that was delayed due to abnormal white blood cell counts, and those records reflect ongoing back and leg pain warranting further surgical intervention, with visible deformity to her spine (Tr. at 714, 718, 761, 778, 781, 785). Finally, the ALJ cites two treatment notes from June 11 and June 28, 2019 (Tr. at 18 (citing Tr. at 723, 733, 820)), but these are the treatment notes reviewing Plaintiff's June 2019 MRI showing recurrent disc herniation with debilitating pain causing functional disability and then admitting her for her second back surgery based on worsening leg pain and severe unremitting pain across her lower back (Tr. at 720, 725, 731, 734). The notes from that procedure reflect obvious disc herniation with calcified pieces of disc extracted from the nerve root (Tr. at 749). The ALJ did not address the substance or context of any of these treatment notes.[4]

Defendant now contends that any failure to fully-discuss the favorable objective evidence in this case was rendered moot by the ALJ's alternative findings at step five of the sequential analysis, which identified three jobs Plaintiff could perform at the sedentary exertional level. ((Def.'s Br. [Doc. #17] at 8); (Tr. at 22).) However, Defendant, like the ALJ,

---

[4] The ALJ also referenced Plaintiff's activities (Tr. at 19) without distinguishing between the time frame before and after her back surgeries. In her Function Reports, and in her testimony regarding the time frame prior to the surgeries, Plaintiff reported some limited activities (Tr. at 51-52). However, she further testified that after her surgeries she could not sit and had to lay in bed on her stomach for most of the day, which is why her doctor now recommends fusion surgery. (Tr. at 52-54.) Similarly, the state agency consultants did not have the full records after the first surgery or any records related to the second surgery. Because the ALJ did not address the impact of Plaintiff's surgeries, it is not clear how these issues were resolved. The ALJ did state that "records that have developed since the state agency consultant's review . . . indicate similar physical findings," (Tr. at 18-19), but that appears to be inconsistent with records reflecting Plaintiff's condition worsening to the point of requiring multiple surgeries, and it is not clear how the ALJ considered or reconciled those issues.

16

fails to recognize that Plaintiff's alleged limitations stem primarily from pain. Indeed, Plaintiff testified that since her surgeries, sitting is a problem, that she cannot sit more than five minutes without crying, and that as a result she spends most of her time laying on her stomach. (Tr. at 52-54; see also Tr. at 770 (noting unable to sit for long periods).) Moreover, the ALJ's finding that Plaintiff could perform sedentary jobs still incorporates the non-exertional limitations set out in the RFC assessment and makes no allowances for the possibility that Plaintiff's pain could preclude those activities as well. Because the ALJ (1) failed to fully and fairly evaluate the evidence with pain factors in mind, and (2) omitted any discussion of the ample objective evidence supporting Plaintiff's claims, substantial evidence fails to support the ALJ's decision.

As a final matter, because the ALJ in this case failed to properly analyze or consider all of the evidence in making her disability determination, the Court need not reach Plaintiff's further contention regarding the need for a physical consultative examination. Accordingly, the ALJ should revisit this issue, if appropriate, upon remand, after fully complying with the directives set out in this Recommendation.[5]

---

[5] The Court does note that the state agency consultant on initial review concluded that a consultative physical examination was necessary and scheduled one for Dr. Eason on February 21, 2018 (Tr. at 81, 84). However, there appears to have been some confusion over scheduling that exam. The appointment was apparently rescheduled by SSA to February 27; on February 20, Plaintiff called SSA to confirm the dates and times of her appointments and SSA confirmed with Plaintiff that she had an appointment with Dr. Eason on February 27. (Tr. at 84.) On February 27, Plaintiff went to Dr. Eason's office but it was not open. (Tr. at 84.) She called SSA and they told her the appointment had been rescheduled to March 22. (Tr. at 84.) During the phone call with SSA on February 27, Plaintiff asked for a date earlier than March 22 because she had a procedure scheduled for that day (which was the preoperative appointment for her March 23 back surgery (Tr. at 620, 622)). The consultative examination was therefore rescheduled with Dr. Eason's office for March 1, 2018. The SSA notes reflect "claimant notified," but it is not clear when or how Plaintiff was notified of the new appointment time during the time period between February 27 and the appointment two days later on March 1. The state agency consultant later found that Plaintiff had "scheduled and rescheduled" appointments with Dr. Eason for physical exams on 2/21/2018, 2/27/2018, 3/1/2018, and 3/22/2018, but had failed to "cooperate/attend consultative exams." (Tr. at 84.) However, the rescheduling from 2/21 to 2/27 to 3/22 was by SSA, and Plaintiff did

17

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). Defendant's Motion for Judgment on the Pleadings [Doc. #16] should be DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #14] should be GRANTED to the extent set out herein.

This, the 18th day of February, 2022.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

appear for the exam on 2/27. When the appointment was rescheduled by SSA to 3/22, she requested an earlier date due to her scheduled back surgery, and while it appears that she did not attend the rescheduled appointment on March 1, it is also unclear what notice she received of that appointment. In any event, given the initial determination that a consultative examination was required and the multiple surgeries and the issues raised by Plaintiff, the ALJ can consider on remand whether a consultative physical examination would be appropriate in this case.